# FREDERICK J. LOWREY, GEORGE P. CASTLE AND WILLIAM O. SMITH, TRUSTEES, v. THE TERRITORY OF HAWAII.

## ORIGINAL.

TRIED FEBRUARY 17-21, 1908.  DECIDED JULY 1, 1908.

### HARTWELL, C.J., WILDER AND BALLOU, JJ.

CONTRACTS—*construction of condition.*

A condition attached to the transfer of a school that the grantee shall not teach or allow to be taught any religious tenet or doctrine contrary to those theretofore inculcated by the grantor and summarized in the correspondence, is not, as interpreted by surrounding circumstances and subsequent practice, broken by a course of study including morning and evening prayer, compulsory attendance at Sunday school with preparation of the International Sunday school lessons, and compulsory attendance at Christian Endeavor exercises.

CONTRACTS—*construction of condition.*

A condition that a school shall be continued as an institution for the cultivation of sound literature and solid science is satisfied by a curriculum including classic and modern literature, geography, physiology, history, agriculture, arithmetic, bookkeeping, algebra and geometry.

DEEDS—*construction.*

> A claim for a liquidated sum of money, arising as an alterna-
> tive from the refusal of a third party to convey land upon condi-
> tion broken, is not assigned by a previous conveyance of all
> lands in or to which the grantor has any claim or demand.

### OPINION OF THE COURT BY BALLOU, J.

The plaintiffs brought an action against the Territory under
R. L. Sec. 2000 to recover the sum of $15,000, alleging a
breach by the Territory of an agreement made in 1849 between
the Kingdom of Hawaii and the American Board of Commis-
sioners for Foreign Missions, the petitioners claiming to be
successors of the board; the agreement in effect being that in
consideration that the American Board would relinquish to
the government its claim to certain land at Lahainaluna and
transfer to the government the seminary buildings, furniture,
books and apparatus therein, the government would continue
the seminary at its expense as an institution for the cultivation
of sound literature and solid science and would not teach or
allow to be taught any religious tenet or doctrine contrary to
those theretofore inculcated by the mission and expressed in the
confession of faith, a copy of which is attached to the petition;
that in case of nonfulfilment of the conditions of the transfer,
the property should revert to the Hawaiian Mission, to be held
in behalf of the American Board or the government should at
its option pay the sum of $15,000.

The breach of this agreement alleged is that since 1903 the
Territory has changed the institution to an agricultural school
and taught no religious doctrine whatsoever, nor sound litera-
ture nor solid science.

The defendant's demurrer to the petition, based on several
grounds, was sustained on the ground that no condition was
made which required the government to give religious instruc-
tion, but merely that no religious tenet or doctrine contrary to

those theretofore inculcated by the mission as set forth in a certain confession of faith should be taught; and that the agreement to teach sound literature and solid science was not broken by a failure to teach those branches of learning otherwise than they would be required to be taught in a technical school and a school of agriculture. *Lowrey v. Territory,* 17 Haw. 225.

Upon appeal to the United States Supreme Court the judgment on the demurrer was reversed on the ground that in view of the circumstances and conditions which preceded the contract and the construction placed upon it by both parties, as set forth in the petition, the agreement required the giving of religious instruction "upon the lines formerly pursued by the mission and subsequently by the government." *Lowrey v. Hawaii,* 206 U. S. 206, 223. The cause, having been remanded with directions to proceed in conformity with the opinion, has been heard upon a large amount of documentary and other evidence. The court has also referred to proceedings of a public nature of which it would ordinarily take judicial notice, and to documents from the public archives when specifically referred to in the exhibits on file.

The institution at Lahainaluna, originally called the High School and afterwards the Missionary Seminary, was founded by the missionaries of the American Board in 1831. From that date until 1849 it was the most notable of the educational institutions founded by the missionaries who, with all their intense theological convictions, still devoted the greater part of their lives to the secular education of an entire nation. The early years of the school were, however, marked with many vicissitudes. Cheever, Sandwich Islands 201, Plaintiffs' Ex. 21. The accounts of the seminary from missionary sources are usually laudatory while those of independent observers are far less flattering. Commodore Wilkes, who visited the seminary in 1841, and who is regarded as an unprejudiced observer from

the missionary standpoint (Cheever, Sandwich Islands 301, Plaintiffs' Ex. 21), reports:

"In all the departments of this establishment I saw nothing but ill directed means and a waste of funds that might have been avoided by proper forecast, and a full examination of the subject by practical men. The school has passed its meridian and is now fast going to decay, a fact which must strike every one on a casual visit." 4 Wilkes, United States Exploring Expedition, 247.

Whatever may have been the hopes of the founders of the seminary the internal testimony of subsequent years shows that the above criticism was well founded. In 1848 the principal's report personifies the seminary as follows: "Though she tries to keep up an appearance of her former greatness and seems sensible of the fact that she is less admired than formerly yet she stands at her post and is contented to do good in a more humble way than when the friends and lovers of her youth stood by and praised her." Report for two years ending May, 1848, Plaintiffs' Ex. 25.

During the next winter studies at the institution were practically broken up by sickness in the principal's family followed by successive epidemics of measles, influenza and whooping cough. School operations were suspended in February and no new class entered pending action of the general meeting of the mission. The report for that year says:

"A new class, according to custom, should be entered this year. It has not been called for yet by us because we thought it best first to hear what changes will actually be decided on by the mission at this meeting. The late unparalleled diminution of population may have also some effect in modifying the views of the mission in regard to this school and render it expedient in their minds to alter its operations or the number of its scholars, these with other reasons induced the teachers to defer the calling of another class until after this meeting of the mission.

"If it is decided by the mission to call a new class we wish

to present a few considerations to the brethren to guide them in their selections. Many thousand dollars of money have been wasted or unprofitably laid out upon young men sent there of only middling ability and low morals. It has been with regret that the teachers have had to select, with a few good ones, many young men of doubtful talents and worth to make up a class when they felt there were enough in the nation that would do honor to their training at the seminary." Report, June, 1848, to April, 1849, Plaintiffs' Ex. 26.

Besides these conditions and the emigration to the gold fields of California, also referred to in the report, the general meeting had to face an embarrassed condition of the funds of the home board and the consequent curtailment of the allowance to the mission. (From report of committee, April 25, 1849, Plaintiffs' Ex. J.) It was under these circumstances that the offer of transfer to the Hawaiian government was made.

The proposal of transfer, under date of April 25, 1849, was upon the express condition "that the said Hawaiian Government agrees that the said institution shall be continued at its expense, as an institution for the cultivation of sound literature and solid science, and, further, that it shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the Mission, which we represent, a summary of which will be found in the confession of faith herewith enclosed, and in that in case of the nonfulfillment or violation of the conditions upon which this transfer is made by the said government, the whole property hereby transferred, hereinbefore specified, together with any additions or improvements which may have been made upon the premises, and all the right and privileges hereby conveyed or transferred to the Hawaiian Government by the said Island Mission shall revert to the said Mission, to have and to hold the same for and in behalf of the American Board of Commissioners of Foreign Missions." The entire letter is set out in *Lowrey v. Hawaii*, 206 U. S. 206, 209.

The confession of faith sent with the letter is evidently, as alleged in plaintiffs' declaration, a printed profession of faith, which, as introduced in evidence (Plaintiffs' Ex. J), is endorsed "Certificates of Church Membership," and reads as follows:

"The Lord Jehovah our Creator has given to the world a law which is holy just and good, that we should love him with the whole heart, and glorify him in all that we do.

"This law I have often broken, and have made myself exceeding sinful in his sight. Now I hate my sins, I repent of them, and renounce them. God so loved the world that he gave his Son that whosoever believeth in him should not perish but have everlasting life. He has invited me to come to him. This I have resolved to do, and to devote myself to his service. I adore his rich grace in calling me to the feast of the gospel. I do now hope for a part in the blessings of his wonderful redemption. I desire to do what I can to promote his glory and the salvation of my fellow men, and I feel it to be a duty and a privilege to take on me the vows of his everlasting covenant.

"I do therefore in the presence of God and before the world, make a solemn declaration of my faith.

"1. I believe in Jehovah;—that he exists without beginning, without end, and without change; that though he is not seen with mortal eyes, yet he is every where present and sees all things; that in power and wisdom, and goodness, in all perfections and excellences he is infinite; that he made the earth and the heavens, men and angels, all worlds, and all that is in them; that he upholds, and governs all according to his own pleasure; that he alone is God and that all beside him that are called gods are vanity and the work of errors.

"2. I believe in the scriptures of the Old and New Testaments, that they are the word of God, and the sure, and perfect and only rule of holy faith and practice.

"3. I believe that man was originally created in the image of God, pure and happy; that he fell by transgression, and that consequently all mankind of every generation are naturally in a state of corruption, guilt and death.

"4. I believe that God in his sovereign mercy, gave early promise of a Savior, and according to his promise, has sent his

Lowrey v. Territory of Hawaii, 19 Haw. 123.

Son into the world, made of a woman and in the likeness of man.

"5. I believe in the Lord Jesus Christ: that he is the Son of God; that he died upon the cross as a propitiation for our sins, and for the sins of the whole world, that there is full redemption in his blood, even the forgiveness of sins, and justification unto life eternal unto all that believe in his Name; that there is none other name given under heaven among men, whereby we must or can be saved; that he is the king of Zion, has all power in heaven and earth, and will judge the quick and the dead.

"6. I believe in the Holy Spirit, the Spirit of God; that it is by him that men are convinced of sin, renewed after the image of God, unto righteousness and true holiness, and fitted to dwell forever in heaven.

"7. I believe that in all ages, Jehovah has had a church in the world, in which he has graciously dwelt, and which he designs to establish in all nations, and to make an eternal excellency; and that it is his will that all who are made partakers of the grace of the gospel should publicly and solemnly join themselves to his church and walk before him in all his statutes and ordinances with a perfect heart.

"8. I believe in the resurrection of the body; in the judgment of the great day, and in the everlasting happiness of the righteous and the everlasting punishment of the wicked.

"Dedication and covenant.

"And now in conformity with these sacred and momentous truths, and in the presence of angels and men I make a solemn dedication of myself and of my all; avouching this day, the Lord Jehovah, Father, Son and Holy Ghost, to be my God, my Father, my Savior, my Sanctifier, and humbly giving up myself to him my chosen portion, to be his, and only his forever. I acknowledge my everlasting and indispensable obligation to glorify God in all the duties of a holy life according to his word. Depending on his all sufficient grace I engage to walk as a christian in the faith and order of the gospel, conscientiously attending the worship of God, in secret, in family, and in public,—upon the sacraments of the New Testament, Baptism and the Lord's supper, and the discipline of his kingdom. I do solemnly covenant to walk with God's people, to watch over

them, and submit to their Christian watch and care, to let my light shine before men, and to seek the glory of God in promoting their happiness and salvation.

"Having confessed my sins, before this church and made a public profession of my faith in Jesus Christ, and with their consent taken on me the vows of his everlasting covenant, and solemnly engaged to be the Lord's, and to walk with his people as a Christian, and as a citizen of Zion, I desire moreover to unite fully with this particular church, and have my name enrolled with theirs, and as one of their members to enjoy their privileges, and to engage with them in the service of God our Savior.

"Honolulu, Sandwich Islands."

The government replied under date of April 27, 1849, accepting the proposals subject to ratification by the legislature and with the following proviso:

"Provided, that in case of the non-fulfilment on the part of this Government of the conditions specified in the letter of the above named gentlemen, it shall be optional with this Government to allow the Institution, with all additions & improvements which may have been made upon the premises, & all rights & privileges connected therewith, to revert to the said Mission, to be held in behalf of the Am. Board of Com. for Foreign Missions, or to pay the sum of $15,000. Provided also that in case this Government shall find it expedient to divert this establishment to other purposes than those of education it shall be at liberty to do so, on condition that it sustain an institution of like character, and on similar principles in some other place on the Islands or pay the sum of $15,000 to said Mission, in behalf of the Mission Board in Boston."

These additional proposals of the government were accepted by the mission under date of April 28, 1849. On May 8 the mission proposed a substitution for the previously presented confession of faith, which was accepted by the government in the following correspondence;

Lowrey v. Territory of Hawaii, 19 Haw. 123.

"Honolulu, May 8th, 1849.

"To his Ex. R. Armstrong
        Minister of Public Instruction
                of His Hawaiian Majesty.

Sir:—

Being instructed by the American Mission in their General Meeting lately adjourned, we would, as their Comtee. most respectfully present for your consideration, the Confession of Faith within enclosed, as a substitute for the one given with the Articles of agreement, transferring the Mission Sem. at L-luna to the Hawaiian Government.

The reasons for requesting the substitution are, that the previously presented Confession,—although according, in all its specified doctrines, with our belief, & with that also of the churches by whom that Institution has been founded & sustained,—is yet not so distinctive, as to present a barrier to the introduction there of other & deleterious doctrines not specified in sd. Confession. It will admit also of teaching in that Seminary, views entirely at variance with those of this Mission & of the churches sustaining it; such as we feel to be entirely subversive of Evangelical Christianity.

Not doubting but that these reasons will commend themselves to the members of His Majesty's Govt. we beg leave to express, in presenting them, the high consideration with which we remain
                Your Ex. most sincere Friends
                        & obednt. Servants

                                W. P. Alexander)
                                C. B. Andrews   )    Comte."
                                S. N. Castle      )

"We Believe,

"1st That there is one only living & true God, the creator, preserver, & Governor of the Universe; a Being self-existent, independent, & immutable, infinite in power, wisdom, justice, goodness, mercy & truth.

"2d. That the Scriptures of the Old & New Testaments were given by inspiration of God; that they contain a complete & harmonious system of Divine truth, & are the only perfect rule of Christian faith & practice.

"3d. That God is revealed in the Scriptures as the Father,

the Son & the Holy Ghost, & that these three are one, &, in all Divine attributes, equal.

"4th.    That God made all things for himself; that he governs all things according to the counsel of his own will, & that the principles & administration of his government are holy, just & good.

"5th.    That our first parents were originally holy; that they fell from that state by transgressing the command of God; & that, in consequence of their apostacy, all their descendants are without holiness, & alienated from God, until their hearts are renewed by Divine Grace.

"6th.    That Christ, being God manifest in the flesh, has, by his obedience, sufferings, & death, made an atonement for sin, on account of which pardon & salvation are offered to all who truly repent & believe in him; & that all who will, may come & take of the water of life freely; but, that such is the aversion of man to these terms of salvation, that all refuse to comply with them, without the special influences of the Holy Spirit.

"7th.    That those who embrace the Gospel, were chosen in Christ before the foundation of the world, that they should be holy & without blame before him in love; & that they should be saved, not by works of righteousness which they have done, but according to the distinguishing mercy of God, through sanctification of the spirit, & belief of the truth.

"8th.    That those who cordially embrace Christ will be kept by the mighty power of God through faith unto salvation.

"9th.    That there will be a general resurrection both of the just & of the unjust; & a day of judgment, when all must give account to Christ of all the deeds done in the body: when the impenitent will go away into punishment, & the righteous into life, both of which will be without end.

"10th.    That the Lord Jesus Christ has a visible church in this world; that the terms of membership are a credible profession of faith in Christ, & of that holiness which is wrought by the renewing grace of God: that none but members of the visible church in regular standing, have a right to partake of the Lord's Supper & that only they & their households can be admitted to the ordinance of Baptism."

"Office of Public Instruction
May 24th 1849.

"To Rev. Wm. P. Alexander )
Rev. C. B. Andrews, & )
S. N. Castle Esq. )

"Gentlemen:

Your letter of May 8th, enclosing a confession of faith, which you request may be substituted for the one accompanying your letter of the 25th of April, has been received, & I have only to state that the request is granted, & the substitution made.

It will be desirable, I think, when a deed of transfer is made, to incorporate this confession of faith in it. But this cannot be done until the transaction is ratified by the American Board, & the Legislature of the Islands.

Very respectfully,
Your humble servant
R. Armstrong,
"Minr. of Pub. Instruction."

The proceedings were ratified by the Hawaiian legislature and in March, 1850, the mission transmitted the following ratification of the prudential committee:

"Honolulu March 1850

"D Sir:

"On behalf of the committee acting for the Mission in the interim of Genl. Meeting I beg leave for the information of His Majesty's Government to communicate to you the following Resolution passed by the Prudential Committee of the American Board of Commissioners for Foreign Missions on the 21st of August 1849, viz.:

"Resolved that the agreement entered into by the Sandwich Islands Mission in April last transferring the Seminary at Lahainaluna in the Sandwich Islands to the Government of said Islands on conditions stated in a letter from the Mission to the Minister of Public Instruction dated Honolulu April 25, 1849, and in a letter from the Minister of Public Instruction dated April 27, 1849, be approved by the Prudential Commit-

tee & that the Secretary having charge of the foreign correspondence give immediate information of this fact to the Mission.

"Very Respectfully

"Your friend & Servt.

"Saml. N. Castle.

"To His Ex R. Armstrong

"Minister of Public Instruction

"of the Hawn Govt."

It is worthy of note that the prudential committee do not appear to have been advised of the substitution of the written confession of faith for the printed profession of faith. Not only is this shown by the dates of the correspondence referred to in their resolution, but the original letter transmitting this resolution from Rufus Anderson, secretary of the A. B. C. F. M. dated September 18, 1849, acknowledging·receipt of letters in detail (Plantiffs' Ex. 1), makes no mention of any letter which by date or otherwise refers to the substitution. After the close of the evidence the court requested the attorneys for the plaintiffs to furnish a copy of the report of the American Board for 1849, in which the correspondence before the Board, set out on pages 239 et seq., ends with the letter of April 28, 1849.

While previous to the establishment of the land commission there were no private titles to land in the Hawaiian Islands and while the failure of the American Board to obtain an award for the property in question left the title in the Hawaiian government (Act establishing land commission, Sec. 8 R. L. p. 1163), there can be no doubt that the relinquishment of the claim of the American Board and the transfer of the personal property constituted valid consideration for this agreement. Nor can we sustain the claim of the Territory that its expenditure of money for improvements with the knowledge of the plaintiffs of existing conditions, both prior and subsequent to the alleged breach, constitutes an estoppel. The only serious questions at issue are whether there has been a breach of the contract in question; if so, whether this action is barred by the statute of

limitations; and whether the deed from the American Board to the plaintiffs gives them the right to maintain this action.

No evidence was offered or attempted to be offered on behalf of the plaintiff to sustain the allegation that religious instruction upon the lines formerly pursued by the mission was continued up to September 1, 1903, or that it ceased to be part of the curriculum on or about that date. In place of proof upon this point the plaintiffs offered the testimony of Sereno E. Bishop as to the course of instruction during his incumbency as instructor and principal at Lahainaluna from 1865 to 1877, and then the testimony of Mr. MacDonald, the present principal, as to the course of instruction after September 1, 1903, leaving the intervening years wholly without offer of proof. As a result of this procedure they claim to have thrown upon the Territory the burden of overcoming the presumption that the state of things testified to by Dr. Bishop continued throughout the period upon which no testimony was offered, or at all events that having shown, as they claim, an alleged breach existing on or about September 1, 1903, the burden of proof was on the government to show that the breach had occurred before that time if it wished to take advantage of the statute of limitations. In further accordance with this theory of the burden of proof the plaintiffs practically refrained from all cross examination of the graduates of Lahainaluna, called by the government, whose attendance covered the period in question, although in each instance the government asked concerning the religious instruction, and at the close of this testimony advanced the further claim that the government had failed to ask the direct question as to whether the particular doctrines enumerated in the confession of faith had been taught.

It would be highly unsatisfactory to have to determine a question of this kind, where ample testimony is available, upon considerations relating to burden of proof and presumptions. We are not driven to a consideration of these questions, how-

ever, because the documentary and oral evidence finally presented gives a comprehensive view of the entire course of instruction from the foundation of the institution to the present time.

One of the avowed objects of the early founders of the seminary was the education of young men to become ministers, yet there is no evidence from which we can find that at any period the institution was a theological seminary in the sense that it prepared its graduates for immediate service in the ministry. The "Laws of the High School" of June, 1835, extracts from which are attached to the declaration, were presented by the directors to the mission as "a more definite and enlarged plan of operation such as they supposed from actual experiment to be practicable." (Plaintiffs' Ex. K, p. 147.) The curriculum is described as "the course of study to be introduced as soon as practicable." (Plaintiffs' Ex. K, p. 153) In 1842 the general meeting, in response to an animated appeal from the American Board on the subject of theological education, resolved that "it is inexpedient at present to attempt anything in the form of a theological school or seminary for the whole islands; but that it be recommended to the brethren of each island to confer together on this subject, enter upon the work as individuals, or where practicable designate one of their number, to devote such a portion of his time as he and they may deem proper to a class in theology." Minutes general meeting, 1842, p. 29 (Plaintiffs' Ex. M, Defendant's Ex. 35.)

Jarves writing of the seminary in 1843 says: "This institution has already supplied an abundance of teachers well qualified for the common schools; and it is designed eventually to educate the most promising youth to form a native clergy." Jarves, Scenes and Scenery in the Sandwich Islands, p. 177 (Defendant's Ex. 33.) In 1847 the design is still "eventually" to be carried out. Bingham, Sandwich Islands, p. 424 (Plaintiffs' Ex. 22.)

The curriculum of the school in 1846 is given as follows:

"The branches taught in the school are Sacred Geography, Universal Geography, History, Sacred and Profane, Hawaiian Grammar, Algebra, Geometry, Trigonometry, Navigation, Mensuration, Surveying, Linear Drawing, Sacred Music, and a variety of miscellaneous branches." Report Minister Public Instruction 1846, p. 52, Plaintiffs' Ex. 19, Defendant's Ex. 1.

After the transfer to the government the institution continued to be primarily for the education of teachers (Report Minister Public Instruction 1850, p. 26; Report President Board of Education 1872, p. 4) from the middle classes of the Hawaiian people (Report President Board of Education 1866, p. 3). Education for the ministry is not referred to in any official report as one of the purposes of the school, but the most that could be said is the statement by Rufus Anderson, secretary of the A. B. C. F. M.: "A year spent in theological study with a missionary is thought sufficient to prepare a pious graduate of Lahainaluna for the pastoral office." Anderson, The Hawaiian Islands, p. 189 (Plaintiffs' Ex. 23.)

The curriculum of the seminary underwent little change between the years 1849 and 1877. The following extracts from the reports in evidence are sufficient to indicate the course of study:

"Their studies have been as follows: Algebra, Geometry, Trigonometry, Surveying, Navigation, Natural and Revealed Theology, Natural and Moral Philosophy, Anatomy, Hawaiian Laws, Chronology, Sacred Geography, Sacred History, Geography, Composition, Punctuation and Music."

Report Minister Public Instruction 1852, p. 40.

"The following is the course of study pursued by the several classes:

"Fourth or Freshman Class.

"Arithmetic, Geography, Chirography, Punctuation, English Language, Ancient History, Natural History, Chronology, Bible History, Chronology and Geography of the Bible, Hawaiian History.

"Third Class.

"Hawaiian Constitution, Bookkeeping, English, Anatomy, Algebra.

"Second Class.

"Geometry, English Language, Political Economy, Church History, Evidences of Christianity, Natural Theology, Moral Philosophy.

"First or Graduating Class.

"Trigonometry, Surveying, Navigation, Natural Philosophy, Optics, Astronomy, English Language, Theology.

"Compositions, debates and declamations are required through the whole course."

Report President Board of Education 1862, p. 8.

In 1863 the American Board withdrew from active work in the Hawaiian Islands, and the Hawaiian Mission was reorganized as a self supporting institution under the name of Hawaiian Evangelical Association. The American Board continued to maintain, and still maintains, a fiscal agent whose chief duty in later years has been the payment of salaries to such of the original missionaries as are still living.

During the next two years the history of Lahainaluna was twice reviewed in public documents, and these are relied on by the plaintiffs as supporting their construction of the contract.

In 1864 the board of education laid before Attorney General Charles C. Harris copies of the documents relating to the transfer of the seminary. The declaration avers that this was in answer to a proposal to change the form of religious instruction, but there is no evidence of this, the attorney general himself saying, "I scarcely know on what point or points I am required to give an opinion." He advises the board of education that a deed of conveyance should have been made yet that no one now can dispossess the government if it shall keep the conditions of the transfer. He quotes the conditions and gives his opinion that the original confession of faith as far as it goes does not differ in anything from what is taught in the Roman and Angli-

can churches by Methodists and probably some others. He then refers to the proposal of a substituted confession of faith, which, judging from the nearness of the date from the 8th of May to the 29th of April, he assumes was before the Prudential Committee in Boston and therefore the one of binding effect. The allegation in the declaration that he "refers to the substitution of the second confession saying that it is a much stronger instrument" is unsupported by the letter. On the contrary the attorney general says that the substituted confession differs from the first in no essential particular except the last article ("last three lines" written in the margin.) These lines relate to the right to partake of the Lord's Supper, and the attorney general argues that these are unessential as articles of the Christian faith. He then concludes, "Should the government not be willing to keep the conditions as far as I have shown them (see p. 8) the property and improvements must be restored to the A. B. C. F. M."

This opinion gives us no material assistance in construing the terms of the transfer nor does the recent opinion of an assistant attorney general also introduced by the plaintiffs throw much additional light. On March 31, 1903, Phillip L. Weaver, assistant attorney general, rendered an opinion to the chairman of the senate committee on public lands. The principal points made are that the condition of the trust as to religious teaching being negative, the government is "not compelled to teach any religious doctrine whatever, and therefore in my opinion cannot be held to·be a sectarian institution."

In 1865 a controversy arose over the right of nomination of teachers for the institution. Samuel N. Castle, agent of the A. B. C. F. M. having urged the board of education to·fill a vacancy and having submitted a list of names which "would be entirely acceptable to the A. B. C. F. M. in case they should be preferred by his Majesty's government to the nominee already named (Plaintiffs' Ex. 2, April 18, 1865), the board of educa-

tion inquired whether Mr. Castle implied that the board had not "full liberty to select the masters in question without reference to any other authorities, and if so to state the nature of the ground on which any such claims to interfere with the internal management of the said school appeared to be founded." (Plaintiffs' Ex. 5, June 9, 1865.) Castle replied at length, giving his views not only upon the question immediately in issue but upon the general construction of the contract. He admitted that literally construed the terms of the conveyance gave no right of nomination and the American Board had no right to interfere until something has been taught in the institution contrary to the confession of faith, but claimed that the instrument was defective in not explicitly recognizing a ratifying or nominating power in the American Board, and that the appointment of any man not acceptable to the A. B. C. F. M. to the post of teacher in the institution would be a violation of the whole spirit of the agreement. (Plaintiffs' Ex. 6, June 13, 1865.)

The board of education replied that it inferred from the letter that the claim might still be advanced that the board had not full liberty to select the masters in question without reference to other authorities and stated that it was of an entirely different opinion. In its view "a suggestion from those representing the founders of the institution is entitled to a respectful and courteous consideration but they desire it to be distinctly understood that a right of nomination does not exist, is not hinted at and was not intended to be reserved on the one side or granted on the other." The board disclaims any desire to defeat the purpose for which the institution was founded "or introduce any doctrine, practice or influence antagonistic to the faith, practice and forms of worship of the founders."

Referring again to the claim of the right of nomination the board "wholly and unequivocally dissent. They are of the opinion that a full compliance with the agreement consists in

appointing persons teaching in the doctrine and after the manner of the Congregational and Presbyterian churches of the United States, but the acceptability or the contrary of the person appointed to the A. B. C. F. M. forms no part of the contract either in letter or in spirit." The board nevertheless appointed Sereno E. Bishop, the original nominee of Mr. Castle. (Plaintiffs' Ex. 7, June 30, 1865.)

In 1877 occurred a vital change in the management and instruction of the seminary. This arose frrom the substitution of English for Hawaiian as the medium of instruction. The consequences are foreshadowed in a letter from Dr. Bishop recommending the change as follows:

"To Hon. C. R. Bishop, President of the Board of Education,
        "Honolulu.
"Dear Sir:

"In accordance with your request, I have the honor to present my views on the expediency & practicability of adopting the English language as the medium of instruction in Lahainaluna Seminary and on the changes in the curriculum of study which such a change from the Hawaiian would be likely to necessitate.

"It has been apparent to me for some months, that the time had arrived when this change should be made. The greatest objection to it is now in some degree obviated; that it would prevent the mass of the more capable Hawaiian youth from availing themselves of the means of Higher education, which they have hitherto received at Lahainaluna in their own language. The multiplication of English schools for natives has now made it possible for perhaps a majority of Hawaiian lads to acquire such an elementary knowledge of English as would enable them to pursue many elementary studies in that language with profit, and in so doing to qualify themselves for higher studies.

"It seems to be now the fact, that the majority of those Hawaiian parents who are disposed to incur expense for the higher education of their sons, will do so only in schools where they will be likely to acquire a good practical knowledge of English. It has hence resulted, that of late years, our fourth class has numbered, on entering, from 12 to 15, whereas they

used to be 30 or 40. At the same time the scholars already pursuing the course have for three years past, shown an unusual degree of persistence in remaining, so that our numbers in attendance have not fallen off in the same proportion, we still having 50, in place of 80 a few years ago.

"I have felt a reluctance to propose this change of language, fearing a necessity to omit in consequence, the long-established and highly valued course of instruction, given in this Seminary in certain studies of an abstract nature, which it would only be possible to impart to Hawaiians in their own tongue. These are such as Moral Philosophy, Political Economy, Evidences of Christianity, and other subjects which have held a leading place in our curriculum, and which require a considerable portion of the time of one teacher. Some instruction in a part of these subjects might possibly be provided for without an increase of the corps of instructors but a part of them would probably have to be omitted, on account of the increased labor devolving on the white teachers, in consequence of teaching so many branches in a language strange to their pupils.

"Could the services of an exceptionally able Hawaiian teacher, such as Rev. M. Kuaea, be secured, some of these subjects might profitably be consigned to his instruction, although no Hawaiian possesses the requisite range of thought and reading to give any considerable ability on such topics.

"As to the most of the other studies pursued, I am convinced that they can be taught with success in English to scholars who on entering are already prepared by two or three years of good study of English. This is especially true of all Mathematics in our course, from written arithmetic up to surveying and navigation, in all which the constant repetition of terms and forms of expression immensely facilitates the work.

"The same is true in *Geography,* if books like Cornell's or Mitchell's series are used, where most of the work is in questions of topography, involving the same element of *repetition of forms.*

"*Natural Philosophy* and *Astronomy,* relating wholly to material and concrete objects, can be taught in English, involving, however, much more labor than Mathematics.

"*History,* which occupies a prominent place with us, might be taught by the use of a well-known & excellent Child's His-

tory. The *Hawn. Constitution*, being printed in both languages, would be readily taught.

"Physiology, and other branches of Natural Science can be taught by the use of Hooker's Child's Book of Nature which is written in simple language.

"It would seem necessary, for the efficient prosecution of some of these studies, that *one* of the teachers should possess a tolerable acquaintance with Hawaiian, in order to explain the sense of terms employed. One teacher, if a man of ability, might find ample success, although ignorant of Hawaiian.

"The labor of instruction will be so largely augmented by the use of a foreign tongue, that it would seem necessary, without adding a third white teacher, to abridge materially the present curriculum. But this abridgment need not, in that case, I think, go so far as to radically change the constituted character of the school, as one for Higher Education. It is also to be borne in mind that for those successfully graduating at Lahainaluna, Oahu College will afford the opportunity of further progress, for which they will then be qualified by their attainments in English.

"Very respectfully yours,

(Signed) "S. E. BISHOP."

Letter of S. E. Bishop referred to in minutes of the Board of Education, January 3, 1877 (Plaintiffs' Ex. 13.)

The proposed change was adopted by the board of education upon motion of E. O. Hall, a member of the board who was fiscal agent of the A. B. C. F. M. (Minutes Board of Education, March 27, 1877. Plaintiffs' Ex. 13.) It went into effect July 1, 1877. Dr. Bishop resigned and H. R. Hitchcock was appointed in his place. This marks a complete severance of the relations between Lahainaluna and the Hawaiian mission or its successor the Hawaiian Evangelical Association. From this date there is no evidence that those representing the mission in Hawaii ever nominated or were consulted in respect to the personnel of the teachers and the principals from that date to the present have been neither ministers nor missionaries.

Mr. Bishop became assistant in the North Pacific Missionary Institute which was reorganized the same year under the auspices of the American Board and the Hawaiian Evangelical Association as a training school for Hawaiian pastors and missionaries. (Reports President Board of Education 1880, p. 26; 1882, p. 37; 1894, p. 86, Plaintiffs' Ex. 13.)

The following extracts give the curriculum at Lahainaluna since 1877: ·

"The Board have also, in response to the popular demand, reorganized the National Seminary so as to make the English language the chief medium of instruction. The curriculum of study now embraces, besides the elementary branches, Algebra, Geometry, Trigonometry, Mensuration and Surveying, Science of Common Things, Bookkeeping, General History, Natural Philosophy and Physiology; all of which are taught in the English language. A few of the studies embracing subjects of Moral Science, History and Political Economy have been taught during the past year in Hawaiian; but these are hereafter to be omitted or taught only in the medium of English. The course also embraces original English Compositions and Orations, and Lectures on the Science and Practice of School Teaching.

"The Nation looks to Lahainaluna as the nursery from which it is to be supplied with teachers, not only for its Common Schools, but also for its Select and English Schools."

Report President Board of Education 1878, p. 8.

"The course of study occupies four years, and is arranged with a view to give the pupils a good knowledge of English. It embraces instruction in all the Higher Mathematics, in subjects of Natural and Moral Science, History and Political Economy, and also instruction in the principles and practice of teaching."

Report President Board of Education 1880, p. 17.

"The prescribed course of studies and instruction is arranged for four years. The first year, it comprises a thorough review of the branches usually taught in Grammar Schools. During the remaining years, the course is more extended, including Higher Mathematics, subjects of Natural and Moral Science,

Lowrey v. Territory of Hawaii, 19 Haw. 123.

History and Political Economy. Instruction in Music forms a part of the regular exercises of the school. The several classes also have exercises in English Composition and Declamation."

Report President Board of Education 1882, p. 20.

"The Seminary is a part of the public school system in which instruction is provided in branches of study more advanced than those pursued at the other select schools. The regular course of instruction continues for four years; but pupils may be advanced according to their scholarship when they enter, so as to complete it in a shorter time. Besides a review of the usual common school branches the course of study embraces Algebra, Geometry, Trigonometry, Surveying, Bookkeeping, History, Natural Philosophy, Moral Science, Political Economy, and Physiology, English Composition, Music, Military Drill, and instruction in the theory and practice of School Teaching. Annual written examinations constitute a very important feature of the Seminary. The promotion of pupils from class to class is based on the results of these examinations."

Report President Board of Education 1884, p. 21.

"Course of Study.

"There are five classes in the school, representing five years' work, and the following is the course of study pursued:

"E Class—Reading, from 'Hawaii's Young People;' Drawing and Natural Science, Observation Work; Geography, Frye's advanced; Literature, De Garmo's Tales of Troy; Arithmetic, to percentage, Atwood; Agricultural Work.

"D Class—Literature, Cook's Ulysses; History, Andrew's Ten Boys; Physiology, Blaisdell's How to Keep Well; Arithmetic, completed, Atwood; Drawing and Music; Printing.

"C Class—Literature, Black Beauty; History, connected stories from general history; Physics, Shaw's Physics by Experiment; Algebra, to unknown quantities, Wentworth; Drawing and Music; Carpentry and Wood Turning.

"B Class—Literature, Evangeline; History, American, Barnes; Grammar; Geometry, through circles; Drawing and Music; Carpentry and Wood Turning.

"A Class—Literature; History, Hawaiian; Composition; Geometry, complete plane; Drawing and Music; Carpentry and Blacksmithing."

Report Superintendent of Public Instruction 1900, p. 88.

"Course of Study.

"E Class—Reading from 'Hawaii's Young People,' Baldwin's 'Fifty Famous Stories;' Great Americans for Little Americans; Reproduction of Stories; Letter Writing; Drill in Capitalization, Punctuation, Paragraphing, Phonics, etc. Memory Selections; Prince's Arithmetic No. IV completed; Geography; Current Events; Physiology, the Human Body and Its Health, by Smith; Music; Mechanical Drawing.

"D Class—Cooke's Stories of Ulysses; Blaisdell's Stories from English History; Mother Tongue, Book I; Current Events; Letter Writing; Short Poems Memorized; Arithmetic, Prince's Book V completed; Frye's Geography; Smith's Physiology; Music; Mechanical Drawing.

"C Class—Eggleston's First American History; Mother Tongue No. I, reviewed and No. II begun; Dole's Young Citizen; Current Events; Letter Writing; Arithmetic, Prince's Book VI, completed; Algebra begun; Agriculture, 'Agriculture for Beginners,' by Burkett, Stevens and Hill; Frye's Geography; Bookkeeping and Drawing.

"B Class—Eggleston's Advanced American History; Guerber's 'Roman History' (given orally, for oral and written reproduction); Current Events; Mother Tongue, No. II; Synopsis of Hawaiian Government; Letter Writing; Poems memorized; Arithmetic, Prince's Book VII completed; Algebra; Frye's Geography; Bookkeeping; Agriculture; 'Agriculture for Beginners,' by Burkett, Stevens and Hill.

"A Class—Alexander's Hawaiian History; National Stories; as Jewish Heroes, Cyrus the Great, Pericles, Alexander the Great, Julius Caesar, Charlemagne, Nelson, Napoleon, etc., given for oral and written production; supplementary reading; Current Events; Letter Writing; Memory Selections; Arithmetic, Prince's Book VIII completed; Wentworth's 'First Steps in Algebra,' reviewed; Geometry, Wentworth's First Book; Frye's Geography completed; Bookkeeping; Agriculture. In addition to the text books frequent reference is made to the publications of the Department of Agriculture."

Report Superintendent of Public Instruction 1906, p. 16.

Under the decision of the United States Supreme Court we are to construe the condition of transfer in the light of the cir-

cumstances which preceded it and the immediate and long continued practice under it. Confining ourselves for the present to the condition respecting religious instruction reading, "It shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the mission which we represent, a summary of which will be found in the confession of faith herewith enclosed," the following possible constructions of the language may be considered:

(1) That the condition is purely negative in character and does not require the teaching of any religious doctrine. This construction is precluded by the decision of the United States Supreme Court.

(2) That the contents of the confession of faith should be taught as a formal doctrine or creed. There is no evidence that the parties ever acted upon this interpretation. No evidence has been presented that the substituted confession of faith was in use at Lahainaluna as a creed, doctrine or standard of religious instruction at any period. Dr. Bishop, who was in the school from 1865 until 1877, testified that he had never seen it. (Transcript, p. 13.) In fact there is no evidence of any formal creed as a standard to which the pupils were required or instructed to adhere.

(3) That religion should be taught and that as taught it should not be contrary to the doctrines mentioned. Thus construed it is obvious that it allows considerable latitude in the amount of religious instruction. If it means that theology shall form part of the curriculum of the school the condition was broken as early as 1877 and any action thereon is long since barred by the statute of limitations applicable to claims against the government. R. L. Sec. 2004. *Hartman v. United States,* 35 Ct. Cl. 106. If, however, the acts and statements of the parties in 1865 are to be relied upon as contemporaneous construction the same must be true of the acts of the parties in 1877 and from thence to the present day. The fact that the

change from Hawaiian to English as a medium of instruction necessarily involved the discontinuance of abstract studies of a theological nature is obvious. The fact that this change was made upon the recommendation of Dr. Bishop and with the full acquiescence of all concerned from 1877 until 1903 is surely as potent as the actions of the parties during the preceding years. To the present day there has been no protest from the American Board or from the Hawaiian Evangelical Association as bodies, but the first objection is from the plaintiffs who are trustees of certain property rights under deed from the American Board, the terms of which will be more fully considered later.

Unless the condition prescribes the amount and extent of religious instruction it has not been broken. From 1877 until the present date the course of religious instruction has been substantially the same. This, as testified to by the graduates and by the present principal, C. A. MacDonald, comprises morning and evening prayer including occasional discussions of passages of the scripture, compulsory attendance at Sunday school with preparation of the International Sunday school lessons furnished by the Hawaiian Board itself, and compulsory attendance at Christian Endeavor exercises Sunday evenings at which the pupils are required to discuss biblical subjects based on the Christian Endeavor topic as given in the Christian Endeavor World. Nothing in this religious teaching is contrary to any religious tenet or doctrine expressed in the substituted confession of faith. In point of time occupied it compares favorably with that prescribed by the "Laws of the High School" of 1835 as attached to the declaration and quoted in 206 U. S. 207. We regard this as a substantial compliance with the condition of transfer.

The question as to whether this constitutes Lahainaluna a sectarian institution within the prohibition of that portion of Sec. 55 of the Organic Act reading, "Nor shall any public

money be appropriated for the support or benefit of any sectarian, denominational or private school or any school not under the exclusive control of the government" is largely a question of the definition of the word "sectarian." This is defined by the Century dictionary as "Of or pertaining to a sect or sects," and the question in this case would depend upon whether the singular or plural were chosen. The religious teaching at Lahainaluna is not that of any particular sect but would apparently be acceptable to all of the denominations usually known as orthodox or evangelical Christian denominations. Whether this is sectarian would depend substantially as to whether the Young Men's Christian Association, Christian Endeavor and the International Sunday school lessons are sectarian or nonsectarian. We believe a majority of persons belonging to any one of the denominations referred to would regard these as non-sectarian, while from the standpoint of a Roman Catholic or even an Episcopalian they would be regarded as sectarian because including a group of sects. As a matter of practical interpretation it may be noted that when the provision in question was under discussion for adoption as Article 97 of the constitution of 1894, a discussion participated in by W. O. Smith, one of the present plaintiffs, who opposed the article, there was no suggestion made that the contemplated provision would affect Lahainaluna.

"Delegate Carter said he had been at some pains to find out what schools would be affected by this article, and found that there were five. The first was Kawaiahao Seminary. Even if this was closed up, the work would be taken up by the Kamehameha Girls School. The second was the Makawao Seminary. This was one of the best and has done splendid work, and he would be glad to see it under the control of the Board of Education. The third was at Kohala, and could be greatly improved and enlarged if taken in hand by the board. There is no girls' school on Kauai. The Hilo Boarding School for Boys is another that will be affected, as it would lose about $400, but that is an insignificant amount compared with its expense. The Kauai Industrial School is the last one. It will be much better

to take Government assistance away from these schools, and he trusted that the report would receive the warm support of the Convention." Convention Proceedings 1894, June 19, Afternoon Session, p. 76.

In any event the question does not appear to be material to the present case, as it can make no difference to the plaintiffs whether the appropriations for the school from time to time were legal or not, while if the adoption of the Constitution of 1894 be regarded in any way as conclusive against the right of the Government to fulfil the conditions of transfer, the claim would be barred by the statute of limitations.

So far as the condition respecting the cultivation of sound literature and solid science is concerned a glance at the curriculum for 1900 and 1906 will show that there is no room for the contention that this condition has been broken. More literature has been taught in recent years than ever before and while the course in mathematics is not quite so extensive as formerly a course which comprises arithmetic, bookkeeping, algebra and geometry cannot be said to fail in instruction in solid science.

Some stress has been laid upon the technical and agricultural instruction now given at Lahainaluna, but technical and agricultural training have been prominent features of the school for over half a century. A few extracts from the reports will illustrate this:

"In the high schools at Lahainaluna, Hilo and Waioli, Kauai, and Kohala, Hawaii, a portion of each day is devoted to labor, and with the most beneficial results. The scholars derive a large portion of their support from their own industry."

Report Minister of Public Instruction 1850, pp. 24, 25.

"One great cause of the firm health of these native youth is their occupation, for at least three hours each day, in the cultivation of the soil, for their own advantage. The institution owns a fine tract of kalo land near by, and from this the pupils derive their food and a large part of their living, by the labor of their own hands."

Report President Board of Education 1858, p. 12.

"A very important part of the system of education adopted at the Seminary is that of manual labor; important, as it furnishes the means of living to the students, most of whom are poor. At the same time it gives that health and vigor to their physical constitutions so necessary to the student; cultivates habits of industry and economy, and affords some knowledge of the principles and methods of agriculture.

"In this connexion, I am happy to approve very heartily of the suggestion contained in the report of the Principal; in regard to the planting of sugar cane on the lands of the Seminary, and hope the means for carrying out the project will be furnished. Should this be done, the students will be greatly benefited by the addition to their means of support, while the institution will share in some degree in the improvement."

Report President Board of Education 1862, p. 9.

"Whenever the locality and opportunities were favorable, a system of labor among the scholars has been promoted, as contributing not only to physical health, but also to the procuring of school books, slates, etc., for the scholars, and making them interested in the cultivation and adornment of their own schools and school land."

Report President Board of Education 1866, p. 3.

"More attention has been paid to the acquisition of the English language, and to industrial and agricultural pursuits, and a marked improvement both in the scholars and in the lands of the Seminary has been the consequence."

Report President Board of Education 1868, p. 3.

"Manual labor is also an important part of the system of education at the Seminary. It furnishes the pupils the means of living; gives health and vigor, and habits of industry and economy."

Report President Board of Education 1882, p. 20.

"Agricultural labor is also an essential feature of the school. By it the pupils furnish all their table supplies. During the past year a carpenter's shop has been built and fully equipped with benches and tools for the use of pupils. The operations of the shop have been already noticed in this report."

Report President Board of Education 1884, p. 21.

"At Lahainaluna industrial training is given in agriculture, carpentry, mechanical drawing, printing, etc., and the students raise most of their own food. It is proposed that still more prominence shall be given to agricultural training in that school. For the materials and tools required in these lines of industrial labor a small appropriation will be asked for."

Report President Board of Education 1896, p. 7.

The emphasis laid on agricultural work in the past few years does not amount to a change in kind but one in degree, apparently prompted by a desire to obtain the federal aid available for agricultural colleges (Report Superintendent Public Instruction 1904, p. 7) an expectation not realized. There has been no change in the official designation of the school. The allegation concerning the name in the declaration appears to have been based upon one reference in the governor's report to the Lahainaluna agricultural school (uncapitalized) apparently overlooking numerous instances in the same and other reports in which the school is referred to under its official title.

While we base our decision upon the consideration of the substantial rights involved, we are also of the opinion that the present plaintiffs are not entitled to maintain this action. They claim as trustees under an indenture dated July 25, 1903, between the American Board of Commissioners for Foreign Missions and F. J. Lowrey, Henry Waterhouse and William O. Smith, trustees, George P. Castle having afterwards been substituted in place of Henry Waterhouse. The indenture in question recites that the "grantor is the owner of certain lands, tenements, hereditaments and the appurtenances thereto belonging, situate in the Hawaiian Islands hereinafter described and referred to, and is desirous of contributing to the support and maintenance of the Board of the Hawaiian Evangelical Association, an Hawaiian eleemosynary corporation organized and established for the corporate purpose of mutual counsel and assistance in the great work of propagating Protestant Christianity, and to enter into common measures for promoting

knowledge and religion, and for preventing infidelity, error and immorality; and said grantor proposes now to convey the said lands and property, hereinafter particularly described and referred to, in trust for the use, benefit and behoof of the said Board of the Hawaiian Evangelical Association, to the extent and in the manner hereinafter set forth, in order to assist said intended beneficiary to effectually carry out its corporate powers and purposes in said Hawaiian Islands, and to that end it has been agreed between the parties hereto and said intended beneficiary that these presents shall be executed."

The property conveyed by the instrument is described as "all and singular the lands and real estate situate in said Territory of Hawaii belonging to said grantor, described and particularly referred to in the schedule hereunto annexed, marked 'Schedule A,' reference to which is hereby made and the same made a part hereof, together with all other lands in the possession of or belonging to said grantor or in or to which said grantor has any right, title, interest, claim or demand whatsoever, at law or in equity, and whether held by it in fee simple, as lessee thereof, beneficiary therein, or otherwise, as fully and to all intents and purposes as though a particular description thereof were herein incorporated and included in said Schedule."

The schedule makes no mention of Lahainaluna, and the only contention which would support the claim of the plaintiffs is that a claim to a sum of money which the defendant has the option of paying as an alternative to the conveyance of certain property upon breach of condition is covered by the language quoted. We do not so construe the language. The claim of the plaintiffs in this respect would be stronger if they were claiming a reconveyance of the land as an alternative, but their declaration takes the position that the option has been exercised by the actions of the government in the matter and that the money is absolutely due. The conveyance in question does not

appear to assign any money claims or demands, whether accruing before or after the conveyance, but only lands in or to which the grantor has any right, title, interest, claim or demand. Still less can it be held to cover a claim not existing at the date of the conveyance, but which according to the allegations of the declaration, accrued thereafter. The general tenor of the declarations of trust supports the conclusion that only real estate was in the contemplation of the parties.

Judgment for the defendant.

D. L. Withington, W. R. Castle and C. H. Olson (Smith & Lewis with them on briefs) for plaintiffs.

M. F. Prosser and C. R. Hemenway, Attorney General, for defendant.