## LOWREY v. TERRITORY OF HAWAII.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF HAWAII.

No. 469. Argued December 6, 1909.—Decided January 24, 1910.

The decision and opinion of this court in *Lowrey* v. *Hawaii*, 206 U. S. 206, construed and followed as to construction of contract involved and liability thereunder of the Hawaiian government.

A condition to teach a definite Christian doctrine is not satisfied by teaching merely a form of general evangelical Christianity.

Where the breach of a covenant of use entails either forfeiture or payment of a specified sum, the grantee has the right of election until disavowal on his part and denial of the alternative obligation, and until then, notwithstanding a continuous breach, the statute of limitations does not run against the grantor.

A deed of trust conveying all lands of grantor or in which it has any interest held in this case to include its right to a liquidated sum in lieu of right of reëntry for a breach of covenant of use of lands theretofore conveyed by it.

19 Hawaii, 123, reversed.

THE facts are stated in the opinion.

*Mr. David L. Withington* for appellant:

It is law of this case that the terms of the agreement require the inculcation of general learning and knowledge accompanied with religious instruction in accordance with the confession of faith submitted to the Hawaiian government, *Lowrey* v. *Hawaii*, 206 U. S. 206, and it is as much a breach to fail to teach doctrine as to teach religion.

The condition for religious teaching is unchanging, definite and absolute to-day. No waiver or statute of limitation bars the action.

A trust of this kind for religion is valid, and, so long as there is anyone in interest demanding its fulfillment, must be

carried out. *Watson* v. *Jones*, 13 Wall. 679. The general doctrines of Christianity are a part of the common law of the country and we are a Christian people. *Holy Trinity Church* v. *United States*, 143 U. S. 457. And see *Vidal* v. *Girard's Executors*, 2 How. 127; *Free Church* v. *Overtown*, L. R. 1904, A. C. 515.

While an independent church may by majority vote change its views as held in *Wiswell* v. *Congregational Church*, 14 Ohio St. 31; *Keyser* v. *Stansifer*, 6 Ohio, 363; *Trinitarian Cong. Soc.* v. *Union Cong. Soc.*, 61 N. H. 384; *Fadners* v. *Braunborg*, 73 Wisconsin, 257; *Landis' Appeal*, 102 Pa. St. 467, that is not the case where the church has been founded for a particular form of worship and doctrine; in such case even all the members cannot alter the doctrine. *Schnorr's Appeal*, 67 Pa. St. 138; *St. Mary's Church Case*, 7 Serg. & R. 517; *Den* v. *Bolton*, 12 N. J. L. 206; *Craigdallie* v. *Aikman*, 1 Dow, 1; *Foley* v. *Wonnter*, 2 Jac. & W. 245; *Leslie* v. *Birnie*, 2 Russ. 114; *Davis* v. *Jenkins*, 3 Ves. & B. 156; *Milligan* v. *Mitchell*, 3 Myl. & C. 72; *S. C.*, 1 Myl. & K. 446.

For cases in which courts have interfered to prevent funds given to support either Unitarianism or Trinitarianism from being used to support the other, see *Roshi's Appeal*, 69 Pa. St. 462; *Rottman* v. *Bartling*, 22 Nebraska, 375; *Attorney General* v. *Hulton*, 7 Ir. Eq. 612; *Miller* v. *Gable*, 2 Denio, 492, 548; 2 Story, Eq., § 1191*a; Attorney General* v. *Pearson*, 3 Meur. 353; *S. C.*, 7 Sim. 290; *Shore* v. *Attorney General*, 9 Clark & F. 355; *Attorney General* v. *Shore*, 11 Sim. 592; *Attorney General* v. *Wilson*, 16 Sim. 210; *Attorney General* v. *Drummond*, 1 Dru. & W. 353; *Christian Church* v. *Carpenter*, 108 Iowa, 650; *Cape* v. *Plymouth Church*, 117 Wisconsin, 155; *Rodgers* v. *Burnett*, 108 Tennessee, 173.

It is the duty of courts to see that dedicated property is not diverted from the trust to which it has been dedicated. *Lamb* v. *Cain*, 129 Indiana, 486; *Smith* v. *Pedigo*, 145 Indiana, 385 and 406; *Princeton* v. *Adams*, 10 Cush. 129. The guaranty of religious freedom does not affect this rule. *Bear* v. *Heasley*, 98 Michigan, 279. The right to the property depends

not on numbers but on those who adhere to the doctrine specified in the dedication. *Baker* v. *Ducker*, 79 California, 365; *Peace* v. *Christian Church*, 20 Tex. Civ. App. 85; *Greek Church* v. *Orthodox Church*, 195 Pa. St. 425; *Dochkus* v. *Lithuanian Society*, 206 Pa. St. 25; *Roshi's Appeal*, 69 Pa. St. 462; *Clark* v. *Brown*, 108 S. W. Rep. 421; *Mack* v. *Kime*, 129 Georgia, 1; *Marien* v. *Evangelical Congregation*, 132 Wisconsin, 650. This property whether in the hands of the mission, government, or trustees was impressed with a trust for a religious use, and failure to enforce a trust is not barred by mere lapse of time. *Oliver* v. *Piatt*, 3 How. 333, 411; *New York Indians* v. *United States*, 170 U. S. 1.

Mere silence or delay will not defeat the action where the obligation is continuous. *Tynan* v. *Warren*, 53 N. J. Eq. 313; *Union College* v. *New York*, 173 N. Y. 38; *Ryder* v. *Loomis*, 161 Massachusetts, 161; *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 107 Massachusetts, 290; *Royal* v. *Aultman Co.*, 116 Indiana, 424; Angell on Limitation, 5th ed., § 72; *Ganley* v. *Bank*, 98 N. Y. 487.

Past breaches can be waived by considering the condition still in effect with knowledge of the breaches. *Hubbard* v. *Hubbard*, 97 Massachusetts, 188; *Payson* v. *Burnham*, 141 Massachusetts, 547; *Linzee* v. *Mixer*, 101 Massachusetts, 512; *Bacon* v. *Sandberg*, 179 Massachusetts, 396. Neglect and remissness may not constitute a breach. There must be an intent not to carry out the contract. *Osgood* v. *Abbott*, 58 Maine, 73; *Mills* v. *Seminary*, 58 Wisconsin, 135; *Coleman* v. *Whitney*, 62 Vermont, 123. Mere silence and delay do not create estoppel against forfeiture. *Gray* v. *Blanchard*, 8 Pick. 284; *Maginnis* v. *Ice Co.*, 112 Wisconsin, 385. Parol assent without change of situation does not destroy express condition. *Jackson* v. *Crysler*, 1 Johns. Cas. 125; *Plumb* v. *Tubbs*, 41 N. Y. 442; *Congregationist Society* v. *Osborn*, 94 Pac. Rep. 881; *Howe* v. *Lowell*, 171 Massachusetts, 575. Patient endurance of repeated breaches does not bar right to rescind when the conduct becomes unendurable. *Gall* v.

*Gall*, 126 Wisconsin, 390; and on this point see also *Bleecker*
v. *Smith*, 13 Wend. 530; *Doe* v. *Woodbridge*, 9 B. & C. 376;
*Dakin* v. *Williams*, 17 Wend. 447; *Doe* v. *Jones*, 5 Exch. 498;
*Farwell* v. *Easton*, 63 Missouri, 446; *Alexander* v. *Hodges*, 41
Michigan, 691; *Adams* v. *Copper Co.*, 7 Fed. Rep. 634. A de-
mand or equivalent act is necessary to set statute in motion.
*Preston* v. *Bosworth*, 153 Indiana, 458; *Water Power Co.*, v.
*Belin*, 69 Minnesota, 253; *Lewis* v. *Lewis*, 74 Connecticut, 630;
*Hadley* v. *Manufacturing Co.*, 4 Gray, 140; *Crane* v. *Hyde Park*,
135 Massachusetts, 147; *Merrifield* v. *Cobleigh*, 4 Cushing,
178; *Ward's Appeal*, 35 Connecticut, 161; *Yeary* v. *Cummins*,
28 Texas, 91; *Link* v. *Jarvis*, 33 Pac. Rep. 201; *Eames* v.
*Savage*, 14 Massachusetts, 425; *United States* v. *Louisiana*, 123
U. S. 32; *Bonnivell* v. *Madison*, 107 Iowa, 85; *French* v. *Mer-
rill*, 132 Massachusetts, 525; *Cromwell* v. *Norton*, 193 Massa-
chusetts, 293; *Stretch* v. *Schenck*, 23 Indiana, 77; *Parks* v.
*Satterthwaite*, 123 Indiana, 411; *Horner* v. *Clark*, 27 Ind. App. 6.

For cases in which the statute did not run from the breach
but the demand, see *Lydig* v. *Braman*, 177 Massachusetts,
212; *Babcock* v. *Wyman*, 19 How. 289; *Stringer* v. *Stringer Co.*,
93 Georgia, 320; *Parker* v. *Gaines*, 11 S. W. Rep. 693; *Good-
win* v. *Ray*, 108 Tennessee, 614; *Bolles* v. *Stearns*, 11 Cush.
320; *Owen* v. *Higgins*, 113 Iowa, 735. Nor after condition
broken until forfeiture asserted. *St. Louis R. R.* v. *McGee*,
115 U. S. 469; *Bybee* v. *Ore. & Cal. R. R.*, 139 U. S. 663;
*Topham* v. *Braddick*, 1 Taunt. 572; *Wright* v. *Hamilton*, 2
Bailey's Law, 51; *Collard's Admr.* v. *Tuttle*, 4 Vermont, 491.

Where an agreement is in the alternative a money demand
does not arise until a refusal to convey. The choice is pri-
marily in the promisor. *Mayer* v. *Dwinell*, 29 Vermont, 298;
*Foster* v. *Goldschmidt*, 21 Fed. Rep. 70; *Dessert* v. *Scott*, 58
Wisconsin, 390; *Smith* v. *Sanborn*, 11 Johns. 59.

The day before payment the obligor, the day of payment
the obligee, can elect. *McNitt* v. *Clarke*, 7 Johns. 465;
*Patchen* v. *Swift*, 21 Vermont, 292; *Ross* v. *Sutton*, 1 Bailey's
Law, 129. See also *Barker* v. *Jones*, 8 N. H. 413; *White* v.

*Toncray*, 5 Gratt. 179. On refusal the election passes to the obligee. *Ramsey* v. *Waltham*, 1 Missouri, 395; *Phillips* v. *Cornelius*, 28 So. Rep. 871; *McMillan* v. *Philadelphia Co.*, 159 Pa. St. 142; *Center* v. *Center*, 38 N. H. 318; *Litchfield* v. *Irvin*, 51 N. H. 51; *Hartmann* v. *United States*, 35 C. Cl. 106.

The effect of the statute of limitations was fully disposed of on the last appeal. 206 U. S. 206.

Plaintiffs are entitled to maintain this action. *McCandless* v. *Castle*, 19 Hawaii, 518; *Oahu R. & L. Co.* v. *Armstrong*, 19 Hawaii, 258. The court below could not authorize a new defense. *Murphy* v. *Utter*, 186 U. S. 95.

*Mr. C. R. Hemenway*, Attorney General of Hawaii, for appellee:

There was no breach of the condition, but substantial compliance has been continuous as to giving religious instruction.

If, however, there has been any breach it occurred as early as 1877 and any action thereon is barred by the statute of limitations. Section 2004, Rev. Laws, Hawaii; *Hartmann* v. *United States*, 35 C. Cl. 106; *Butler* v. *United States*, 23 C. Cl. 335; *Carlisle* v. *United States*, 29 C. Cl. 414; *Aachen & Munich Fire Ins. Co.* v. *Martin*, 156 Fed. Rep. 654; *Brown* v. *Houdlette*, 10 Maine, 399; *Davis* v. *Brown*, 98 Kentucky, 475; *Wilcox* v. *Plummer's Exrs.*, 4 Pet. 172; *Finn* v. *United States*, 123 U. S. 227; *United States* v. *Connor*, 138 U. S. 61; *United States* v. *Greathouse*, 166 U. S. 602; *United States* v. *Wardwell*, 172 U. S. 48; *Kendall* v. *United States*, 107 U. S. 123; *De Arnaud* v. *United States*, 151 U. S. 483.

These cases also show that the statute runs from the time the claim becomes perfect and complete. On this point see also *Riddle* v. *Beattie*, 77 Iowa, 168; *Kane* v. *Bloodgood*, 7 Johns. Ch. 90.

Whenever there is an adequate remedy at law the statute will be held to apply, even though relief may be sought in equity, and the statute will run from the time the first cause

of action accrues. *Jewell* v. *Jewell*, 139 Michigan, 578; *Hayward* v. *Gunn*, 82 Illinois, 385; *Agens* v. *Agens*, 50 N. J. Eq. 566; *Roberts* v. *Ely*, 113 N. Y. 128; *Egerton* v. *Logan*, 81 N. C. 172; *Townsend* v. *Eichelberger*, 51 Ohio St. 213; *Hostetter* v. *Hollinger*, 117 Pa. St. 606; *Wallace* v. *Lincoln Bank*, 89 Tennessee, 630; *Merton* v. *O'Brien*, 117 Wisconsin, 437; *Cone* v. *Dunham*, 59 Connecticut, 145; *Farnam* v. *Brooks*, 9 Pick. (Mass.), 212, 242; *Merrill* v. *Monticello*, 66 Fed. Rep. 165; *S. C.*, 72 Fed. Rep. 462.

The findings of fact from which the conclusion that there was no breach reached by the Supreme Court of Hawaii necessarily are binding and conclusive upon this court. *Halsell* v. *Renfrow*, 202 U. S. 287; *San Pedro Co.* v. *United States*, 146 U. S. 120; *Zeckendorf* v. *Johnson*, 123 U. S. 617; *Eilers* v. *Boatman*, 111 U. S. 356; *Sturr* v. *Peck*, 133 U. S. 541; *Sims* v. *Sims*, 175 U. S. 162; *Holloway* v. *Dunham*, 170 U. S. 615; *Idaho Co.* v. *Bradbury*, 132 U. S. 509; *Grayson* v. *Lynch*, 163 U. S. 468.

Plaintiffs are not entitled to maintain this or any cause of action for a breach of this agreement. The agreement under which they hold only refers to real property and not to a claim of this nature.

Even if this might have been raised by demurrer, it is not waived, as no officer could waive a defense for the Territory. *Peacock* v. *Republic of Hawaii*, 11 Hawaii, 404; *Kendall* v. *United States*, 107 U. S. 123; *Carlisle* v. *United States*, 29 C. Cl. 414; *Finn* v. *United States*, 123 U. S. 227; *Christie Street Com. Co.* v. *United States*, 129 Fed. Rep. 506; *De Arnaud* v. *United States*, 151 U. S. 483; *United States* v. *Utz*; 80 Fed. Rep. 851.

MR. JUSTICE MCKENNA delivered the opinion of the court.

This is the second appeal in this case. The first appeal was from a judgment in favor of the Territory, entered upon demurrer to the complaint, which judgment was reversed. *Lowrey* v. *Hawaii*, 206 U. S. 206.

The action is for the sum of $15,000, which the Hawaiian government reserved the right to pay, instead of deeding back certain lands conveyed to it by the American Board of Commissioners of Foreign Missions in 1849. The facts as alleged in the complaint are set out with considerable fullness in the report of the case on the first appeal and need not be repeated. Upon the return of the case to the Supreme Court of the Territory an answer was filed, denying "all and singular the matters, allegations and things set forth," and giving notice that the Territory would "rely in making its defense *inter alia* on the statute of frauds." Subsequently the plaintiffs made a motion upon the record and "upon the judgment in the Supreme Court of the United States" for judgment. The Territory made a motion to amend its answer to set up the statute of limitations. The plaintiffs' motion was denied, that of the Territory was granted, to which rulings plaintiffs excepted. Testimony was taken, which was directed principally to the question of the breach of the condition upon which the conveyance to the government was made. The court, in its opinion, says that, in addition to the "large amount of documentary and other evidence," it has "also referred to proceedings of a public nature, of which it could ordinarily take judicial notice, and to documents from the public archives, when specially referred to in the exhibits on file." Concluding from this and the other evidence that the plaintiffs were not entitled to recover, it rendered judgment for the Territory. 19 Hawaii, 123.

The decision on the first appeal is an important factor in the determination of this, for upon that, as a guide, the Supreme Court of the Territory accepted evidence and determined the meaning of the agreement by which the lands were conveyed.

The American Board of Foreign Missions for many years prior to 1850 conducted a Protestant mission in the Hawaiian Islands, and, as an essential part of its work, carried on many schools. Its most notable work was centered in a school, established in 1831 at Lahainaluna, on the island of Maui, where

it possessed a large tract of land. The purpose for which the conveyance of this school to the Hawaiian government was made and the course of instruction in it, before and after the conveyance as explaining that purpose, make the controversy in this case. It is contended by appellants that the course of instruction in the institution comprised not only the usual topics belonging to secular learning, but included also direct religious teaching and training in the doctrine represented by the mission; that is, the doctrines of the Congregational and Presbyterian churches of the United States, and was expressed in a "Confession of Faith," which was attached to the agreement that transferred the property to the Hawaiian government. "The central purpose of the agreement was," counsel for appellant contended on the other appeal; "to 'continue' an established institution, the keystone of a system with defined and well-known aims, the chief being the promotion of religion by instruction in definite religious truth." The opposing contention was that the doctrine to be taught was not specialized, that there were no restrictions upon the course of instruction, except that it should not be, using the words of the agreement, "contrary to those theretofore inculcated by the mission;" and, insisting that those words constituted the complete measure of the obligation of the government, resisted the attempt of the appellants to go outside of them to ascertain the purpose of the parties. These contentions were considered and the grounds of them accurately distinguished. The contention of the appellants was accepted. It is not necessary to repeat our reasoning at length. Our conclusion was that the Hawaiian government engaged to teach not only secular science, but the definite religious doctrine expressed in the confession of faith, attached to the agreement. The latter, we said, was "not in a formally executed paper," but was found in a correspondence. "And taking the whole of it," it was said, "there is a very little aid from extrinsic evidence needed to demonstrate its meaning and purpose." And after considering some parts of the correspondence, we con-

cluded as follows (p. 221): "The correspondence concerned the transfer of a school established in 1835, the design of which was to perpetuate the Christian religion, and with an object described to be 'still more definite and of equal or greater importance,' that is, 'to educate young men to be. Christian ministers.' A religious instruction was prescribed. All this the government was informed of when the proposition was made to transfer the school to its 'fostering care and patronage.' And the government accepted the grant, accepted as it was tendered, and necessarily for the purpose it was tendered."

The right to resort to extrinsic evidence, against the contention of the Territory, was decided, but the amount of aid that the correspondence needed or received from such evidence we explicitly pointed out. We said that the "justness" of the conclusion expressed in the paragraph quoted above was, without extrinsic evidence, "almost indisputable," and that it became "indisputable if extrinsic evidence be considered." In other words, it was decided that the probative force of the correspondence was sufficient without other evidence to establish the agreement in accordance with the contention of appellants. The Supreme Court of the Territory underestimated this ruling and entered into an extensive inquiry of circumstances from which it decided the agreement to be what this court had decided it not to be.

It may be that we could rest the case on the prior decision without considering the new evidence which was received, or, rather, the new facts which are expressed in the findings of the Supreme Court. But as that learned court based its decision upon them and the Territory earnestly urges them as taking this appeal out of the ruling on the former appeal, we have given consideration to them. We cannot, however, without extending this opinion to a great length, quote them in full, and will, therefore, only state their character and what they establish or tend to establish.

The findings set forth the circumstances which preceded

the transfer to the government, as exhibited in the observations of Commodore Wilkes in 1841, and the report of the principal of the school in 1848. Commodore Wilkes observed a defective and inefficient administration of the affairs of the school and its funds, which might have been "avoided" by a full examination of the subject by "practical men," and a decadence in consequence from its "meridian." The principal's report personified the school and made it conscious of the loss of admiration, but he said "she stands at her post, and is contented to do good in a more humble way than when the friends and lovers of her youth stood by and praised her." He said that during 1849 "studies at the institution were practically broken up by reason of various sicknesses which attacked the principal's family, and that, in consequence, "school operations were suspended in February, and no new class entered pending the action of the general meeting of the mission," and he "thought it best" to await that meeting, for, as he said, "the late unparalleled diminution of the population may also have some effect in modifying the views of the mission in regard to this school and render it expedient in their minds to alter its operations or the number of its scholars." If a new class was to be called, he said, he had "a few considerations, 'to present,' to the brethren to guide them in their selections." And again: "Many thousands of dollars have been wasted or unprofitably laid out upon young men sent there of only middling ability and low morals. It has been with regret that the teachers have had to select, with a few good ones, many young men of doubtful talents and worth to make up a class when they felt there were enough in the nation that would do honor to their training at the seminary."

"Besides these conditions," the findings of the court recite, "and the emigration to the gold fields of California, the general meeting had to face an embarrassed condition of the funds of the home board and the consequent curtailment of the allowance to the mission. (From report of committee,

April 25, 1849.) It was under these circumstances that the offer of transfer to the Hawaiian government was made."

It may be well to comment on the facts as we go along, and we may say we see nothing in these declarations and reports that militates with the views of the agreement expressed in our former opinion. We see no intention in them or reason for abandoning the purpose for which the school was founded. Indeed, intention and reason for its better fulfillment by a transfer to the government. The school would receive more constant support under the government. The young men of "doubtful ability and low morals" might not seek its instruction, could be more easily rejected if they did so, and those "in the nation that would do honor to their training at the seminary" might be attracted by the sanction which would be given to their ability and morals. That this was the hope which induced the transfer is almost expressed in the correspondence which forms the agreement.

This was in effect declared in the opinion on the first appeal and the quotation from that becomes apposite. Stating a part of the correspondence which contained the offer to the government, we said (206 U. S. p. 220):

"The Mission reminds the Minister of Public Instruction that the seminary was established in 1831, 'to promote the diffusion of enlightened literature and Christianity throughout the islands,' and that it had been unceasingly watched over, cherished and cared for by the Mission, and that $77,000 had been expended for its benefit. It was stated that in consequence of debts incurred 'in the prosecution of its labors of benevolence and mercy' the American Board of Commissioners of Foreign Missions was compelled to diminish its grants to each of the missions under its care, including the Hawaiian mission, and that the latter for that reason would be 'unable to carry forward its operations with the vigor to be desired in all of its departments of labor.' In view of these facts, it was stated and believed that under the circumstances the transfer of the institution 'to the fostering care and patronage of the

government' would 'promote the highest interest of the Hawaiian people.' An offer was then made to transfer the seminary with the conditions which we have referred to. A confession of faith was enclosed. The government modified the proposal by reserving the right to pay $15,000, as an alternative to the reversion of the property to the Mission if the government should not fulfill the conditions of the grant. The modification was accepted, and in a subsequent communication a new confession of faith was substituted to that originally proposed."

And from this, it followed, we further said, as we have seen, that the school was established "'to perpetuate the Christian religion,'" and had purpose, still more definite and of equal or greater importance, that is, "'to educate young men to be Christian ministers.'" And of this, "the government was informed of when the proposition was made to transfer the school to its 'fostering care and patronage.'"

There are, however, other findings of fact. It is found that there was substituted for the first confession of faith, which was printed, a second confession of faith, which was written. In a letter which accompanied the latter it stated that the first was "not so distinctive as to prevent a barrier to the introduction there (in the school) of other and deleterious doctrines not specified in the said confession." It is said by the Supreme Court of the Territory that it was "worthy of note" that it did not appear that the "Prudential Committee" had been advised of the substitution. We think this unimportant. Even if it did not, therefore, become a part of the agreement, it certainly expressed the purpose of the agreement. It was, however, considered by the parties as a part of the agreement.

The curriculum of the school from 1835 to 1863 is inserted in the findings, by which studies were arranged for a course of four years. This appears:

"The laws of the high school were read, amended and the different articles adopted as follows:

"'Whereas in the good providences of God, the experiment

of the high school established by the mission in 1831 having proved successful, and having accomplished all that could reasonably have been expected, and the necessity of such an institution still continuing, the directors now lay before the mission a more definite and enlarged plan of operations, such as they suppose from actual experiment to be practicable, and of the highest interests to the moral, social, literary and spiritual condition of this people.' "

The design of the high school is set forth in six chapters, which express provisions for teaching general literature and the sciences, and the following, being paragraphs one and four and paragraph five of chapter one.

"To aid the Mission in accomplishing the great work for which they were sent hither; that is, to introduce and perpetuate the religion of our Lord and Saviour Jesus Christ, with all its accompanying blessings, civil, literary and religious."

"4. Another object still more definite and of equal or greater importance, is, to educate young men of piety and promising talents, with a view to their becoming assistant teachers of religion, or fellow laborers with us in disseminating the gospel of Jesus Christ to their dying fellowmen.

"5. He shall also watch over the moral and spiritual interests of the scholars; he shall cause a portion of their weekly studies to be directed to the great truths of the Bible, that while they increase in science and literature they may have the means of that knowledge which makes wise unto salvation."

It is found, however, that "so far as the proposed curriculum contemplated the preparation of graduates of the school for immediate service in the ministry, it was never carried out, though frequently referred to by contemporaneous writers as the eventual design of the school."

It is further found that the main object of the school from 1835 to 1839 was the education of Hawaiian teachers for the common schools. The curriculums of other years are given, and it is found that, "after the transfer to the government the

institution continued to be primarily for the education of teachers (Report Minister Public Instruction, 1850, p. 26; Report President Board of Education, 1872, p. 4); from the middle classes of the Hawaiian people (Report President Board of Education, 1886, p. 3). Education for the ministry is not referred to in any official report as one of the purposes of the school, but the most that could be said is the statement by Rufus Anderson, secretary of the A. B. C. F. M.: " A year spent in theological study with a missionary is thought sufficient to prepare a pious graduate of Lahainaluna for the pastoral office." Anderson, The Hawaiian Islands, p. 189.

And there are findings as to the events of 1863, 1864 and 1865, the principal of which was the opinion of the Attorney General, and a dispute between the mission and the Board of Education as to the right of appointment of teachers.

The opinion of the Attorney General recognized that the school was received by the government and was held by it, under conditions which, if not performed, would require the government to reconvey the property or pay the mission fifteen thousand dollars.

The dispute over the appointment of teachers arose in April, 1865. In a letter to the President of the Board of Education the mission asserted the right to appoint, and suggested the names of certain persons. The Board of Education replied, asking for the grounds " on which any such claim to interfere in the internal management of said school appear to you to be founded." The mission replied, asserting the right of appointment as a means of accomplishing the purpose of the transfer. It was said that nothing was "more evident than that the mission intended carefully to guard against the introduction into the institution of any doctrine, practice or influence antagonistic to its own faith and practice and form of Christian worship." And they asserted, further, that "nothing could be clearer than that the missionaries contemplated still to have this a co-operating institution to aid them, as it had already done in times past, in the diffusion of

solid science and Christianity *as they understood it,* as benevolent Congregationalists and Presbyterians of the United States, who had contributed to build and sustain the institution understood and practiced it." And it was said that "an object so dear to them would not have been given up without the intention of so guarding in the future as to have it continue to aid instead of defeat the purpose for which it was founded." In further emphasis of this intention the writer of the letter said that he knew "that the intention was to secure the continued co-operation of the seminary in the work which the American Board was prosecuting" there "through its mission." The Board of Education admitted that the institution was to be continued so as to "aid instead of defeating the purpose for which it was founded," and said, "Nothing had been done to justify the intimation that the board" had "any desire to defeat such purpose or introduce any doctrine, practice or influence antagonistic to the faith, practice and forms of worship of the founders." The board dissented from the view expressed by the mission, that the appointment of any man not acceptable to it to the post of teacher was a "violation of the whole spirit of the agreement," and said that a full compliance of the agreement consisted "in appointing persons teaching in the doctrine and after the manner of the Congregational and Presbyterian churches of the United States." The board concluded by saying that they were aware that if they did not see fit to carry on the institution according to the terms of the contract, they had to reconvey it or to pay the sum of $15,000, and that if the views expressed were not satisfactory, the board would think favorably of a proposition to reconvey it at once.

It will be seen, therefore, that from the agreement, as gathered from the correspondence and from the extrinsic evidence which we have detailed, there can be no doubt that the school was transferred by the mission and accepted by the government upon the condition that definite Christian doctrines should be taught, namely, doctrines which constituted

the belief of the Congregational and Presbyterian churches of the United States and not merely some form of general, evangelical Christianity.

Religious instruction, "represented by the second or substituted confession of faith," according to finding 23, was continued from 1875 to 1877.

In December, 1876, upon the recommendation of · Dr. Bishop, a change was made from the Hawaiian to English as a medium of instruction, comment upon which will be presently made. We omit, as not important, the curriculum as to secular studies after 1877. The findings as to religious instruction must, however, be given in full:

"There is no evidence that the substituted confession of faith was in use at Lahainaluna as a creed, doctrine or standard of religious instruction at any period. There is no evidence of any formal creed as a standard to which the pupils were required or instructed to adhere.

"(29) From 1877 until the present date the course of religious instruction has been substantially the same. This includes morning prayer, including occasional discussions of passages of the scripture, compulsory attendance at Sunday-school with preparation of the international Sunday-school lessons furnished by the Hawaiian board itself, and compulsory attendance at Christian Endeavor exercises Sunday evenings, at which the pupils discuss biblical subjects based on the Christian Endeavor topic as given in the Christian Endeavor World. Nothing in this religious teaching is contrary to any religious tenet or doctrine expressed in the substituted confession of faith. Mr. Macdonald, who has been principal since 1903, testifies that no creed had been taught during that time at the school, but that he had tried to make upright, truthful Christian men, and held Christ up as the best example to follow; that he had taught nothing about the Pope, or the doctrine of the trinity, or the doctrine of Adam's fall, or that the descendants of Adam were without holiness and alienated from God until their hearts were renewed with divine grace; that on

Sunday there was a Sunday-school and occasionally, in the morning, a preaching service, in the evening a Christian Endeavor meeting; that the first year he was in Lahainaluna the boys were allowed to go to Lahaina to their own churches, but since then, with the exception of the day scholars numbering ten or twelve, they were required to stay on the ground on Sunday and attend Sunday-school and the evening exercises; that the chapel exercises on week day mornings lasted about ten minutes and consisted of a hymn, a portion of the scripture and a repeating of the Lord's Prayer in unison, and occasionally incidental remarks by the principal regarding the passage of the scripture; that there was no direct Christian instruction given in the class room exercises during the week days other than moral instruction, as teaching the boys to do their work honestly; that the Sunday morning exercises consisted of a regular system of Bible instruction following the international Sunday-school lesson series purchased from the Hawaiian Board; that the Sunday-school lessons were assigned in advance; that in the Christian Endeavor meetings the Christian Endeavor topic in a modified form as given in the Christian Endeavor World was usually taken, and prayers sometimes offered by the boys and the teachers.

"(30) There is no evidence of any protest with regard to Lahainaluna or the course of study there from the American Board or from the Hawaiian Evangelical Association as bodies, but first objection is from the plaintiffs who are trustees of certain property rights under deed from the American Board."

It is further found that "technical and agricultural training have been prominent features of the school for over half of a century, and the emphasis laid on agricultural work in the past few years does not amount to a change in kind, but one in degree. There has been no change in the official designation of the school."

In 1903 there was a movement to obtain the Federal aid available for agricultural colleges, in connection with which the Deputy Attorney General gave an opinion as to the

character of the school, the conditions upon which the government of Hawaii had received it and the effect of the provisions of the Organic Act of the Territory, that "no public money be appropriated . . . for the support or benefit of any sectarian, denominational or private school." The opinion is quoted at length in the findings, but we are only concerned with parts of it. It recognizes that the school was received upon the condition of cultivating sound literature and solid science. This, it was said, was affirmative and could not be escaped. The provision for religious instruction, he declared, was negative, and was satisfied by no religious teaching whatever. His conclusion was, and we quote his words, "So long as the government maintains this school it shall not teach any doctrine contrary to the confession of faith, but it is not compelled to teach any religious doctrine whatever, and therefore, in my opinion cannot be held to be a sectarian institution." And further, "that the school is not a sectarian institution under the prohibition stated in section 55 of the Organic Act."

As we have said, the Supreme Court of the Territory gave especial prominence to the ruling on extrinsic evidence, and made it contradictory to the agreement as expressed in the correspondence. This result was worked out, as it seems to us, by giving too much effect to the curriculum of the school after 1877. That, indeed, might be considered as tending to show that the agreement had been abandoned or its conditions waived, but not that it did not exist. To this proposition of abandonment or waiver we then will address ourselves, and as relevant to it the views of the Supreme Court of the Territory may be given. They are exhibited in the following paragraphs (pp. 146, 147):

"Under the decision of the United States Supreme Court we are to construe the condition of transfer in the light of the circumstances which preceded it and the immediate and long continued practice under it. Confining ourselves for the present to the condition respecting religious instruction reading,

'It shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the mission which we represent, a summary of which will be found in the confession of faith herewith enclosed,' the following possible constructions of the language may be considered:

" (1) That the condition is purely negative in character and does not require the teaching of any religious doctrine. This construction is precluded by the decision of the United States Supreme Court.

" (2) That the contents of the confession of faith should be taught as a formal doctrine or creed. - There is no evidence that the parties ever acted upon this interpretation. No evidence has been presented that the substituted confession of faith was in use at Lahainaluna as a creed, doctrine or standard of religious instruction at any period. Dr. Bishop, who was in the school from 1865 until 1877, testified that he had never seen it. (Transcript, p. 13.) In fact, there is no evidence of any formal creed as a standard to which the pupils were required or instructed to adhere.

" (3) That religion should be taught and that as taught it should not be contrary to the doctrines mentioned. Thus construed it is obvious that it allows considerable latitude in the amount of religious instruction. If it means that theology shall form part of the curriculum of the school. the condition was broken as early as 1877 and any action thereon is long since barred by the statute of limitations applicable to claims against the government. R. L. Sec. 2004; *Hartman* v. *United States*, 35 C. Cl. 106. If, however, the acts and statements of the parties in 1865 are to be relied upon as contemporaneous construction the same must be true of the acts of the parties in 1877 and. from thence to the present day. The fact that the change from Hawaiian to English as a medium of instruction necessarily involved the discontinuance of abstract studies of a theological nature is obvious. The fact that this change was made upon the recommendation of Dr. Bishop and with the full acquiescence of all concerned

from 1877 until 1903 is surely as potent as the actions of the
parties during the preceding years. To the present day there
has been no protest from the American Board or from the
Hawaiian Evangelical Association as bodies, but the first ob-
jection is from the plaintiffs who are trustees of certain prop-
erty rights under deed from the American Board, the terms
of which will be more fully considered later.

"Unless the condition prescribes the amount and extent of
religious instruction it has not been broken. From 1877 until
the present date the course of religious instruction has been
substantially the same."

The first proposition, the court said, was precluded by our
first decision; of the other two, the court felt free to exercise
its judgment. In this it committed error. We have shown
how antagonistic the contention of the parties were, and we
tried to be clear in our decision of them. We did more than
decide that the condition as to religion was not negative.
We gave it more force than simple inhibition of teaching
something which was not inconsistent with the religion of the
mission. We gave it the force of a requirement to teach that
religion, and more, to educate young men to teach it. The
Supreme Court, however, says that there is no evidence that
the parties ever acted upon the interpretation "that the con-
tents of the confession of faith should be taught as a formal
doctrine or creed." Exactly what is meant by the words
"formal doctrine or creed" is not clear, but if they mean the
religion of the mission, the conclusion was not open to the
court to draw nor do the findings sustain it. Dr. Bishop tes-
tified, it is true, that he had never seen the confession of faith
until it was shown in the present case, but he also testified
that "the system of doctrine which was taught was substan-
tially the old orthodox, Congregational or Presbyterian doc-
trine." As to the confession of faith, he said, "that it very
well represented the form of doctrine taught at Lahainaluna."
Nor do we draw the same conclusion from the change from
Hawaiian to English as a medium of instruction that the Su-

preme Court drew. Dr. Bishop did recommend the change,
and he expressed a fear that the consequences might be an
omission of studies of an abstract nature, in which he included
"evidences of Christianity;" but he suggested such instruction
could be committed to the "exceptionably" able Hawaiian
teacher whom he mentioned. But there is nothing in that to
show that a definite form of religion could not be taught. There
might be difficulty in it, of course, but that such a difficulty
could not be overcome would take all purpose or justification
from missionary societies. Besides, because the school met dif-
ficulties, and might have to yield temporarily to them for vary-
ing periods of time, cannot be considered as conclusive of the in-
tention of the parties to abandon the purpose expressed in the
agreement or to waive its obligations. And this is an answer
to the other contentions of the Territory. That the mission
would encounter difficulties in its way was no doubt guessed
when the school was founded. It was demonstrated by trial.
For the better execution of the purpose of its foundation, the
mission transferred it to the government. The government,
too, met difficulties. Its duty was to strive against them,
overcome them if possible, not to make them a reason to vio-
late its contract. But it is said by the Supreme Court that if
the condition be "that theology shall form part of the cur-
riculum of the school, the condition was broken as early as
1877, and any action thereon is long since barred by the stat-
ute of limitations applicable to claims against the govern-
ment." This might be if the obligation of the government
had been to pay money simply. Its obligation was not that,
as we have seen, but to perform a trust expressly assumed by
it. In other words, it was the grantee of an estate upon con-
dition, having the right, however, to elect to pay $15,000 as
an alternative of the performance of the condition. We find
no evidence of such election in what occurred in 1877, nor
indeed long subsequently to that date. The circumstances
must be kept in mind and the relation of the parties. The
government had received a gift of valuable property, the

product of voluntary contributions. It was given and received for a special purpose, the purpose for which the contributions were made. The government accepted it and pledged its faith for the execution of the purpose, a faith, we may assume, which was as much relied on as the sanctions which accompanied it. It is not possible to believe that the government had so little sense of its obligations that if it had intended to depart from its agreement it would not have offered to reconvey the property or tender the execution of the alternative which it had reserved; and we certainly cannot hold that a mere change in the course of studies, which might have temporary excuse, instantly acted to make the grantors of the property a claimant for money against whom the statute of limitations would immediately begin to run. The government's right should not be overlooked in this connection. The following is the condition expressed in the proposal made to the government: "That in case of the nonfulfillment or violation of the conditions upon which this transfer is made by the said government, the whole property hereby transferred, hereinbefore specified, together with any additions or improvements which may have been made upon the premises, and all the rights and privileges hereby conveyed or transferred to the Hawaiian government, by the said island mission, shall revert to the said mission, to have and to hold the same for and in behalf of the American Board of Commissioners of Foreign Missions." The acceptance of the government was as follows: "That in case of nonfulfillment on the part of the government of the conditions specified it shall be optional with this government to allow the institution, with all additions and improvements which may have been made upon the premises, and all rights and privileges connected therewith, to revert to the said mission or pay the sum of $15,000." The onus, therefore, was upon the government to act, not upon the mission. To avert the reversion of the property to the mission a way was provided, but it did not enter into the head of anybody that by a fail-

ure to adopt it instantly upon a change of studies the property passed back to the grantor. ·· But such was the inevitable result if there was a breach of the conditions in 1877, and such was the result if there was a breach later than 1877. It might be contended that such result would not ensue without some action upon the part of the mission. But it was certainly optional with the mission to treat the breach, if there was a breach, as a forfeiture. It is said in *Hubbard* v. *Hubbard*, 97 Massachusetts, 188, that it is optional with the grantor of an estate upon condition, in case the breach of the condition occurs, whether he will avail himself of the same as a forfeiture of the estate. To do so, it is further said, requires action on his part, and, if he is not in possession, usually requires entry for breach of condition. Until such entry the grantee holds his estate liable only to be defeated, but it is not actually determined by the forfeiture.

It is said in *Carbon Block Coal Co.* v. *Murphy et al.*, 101 Indiana, 115, 117, 118: "'A condition may be waived by the one who has a right to enforce it, . . . But a mere silent acquiescence in, or parol assent to, an act which has constituted a breach of an expressed condition in a deed, would not amount to a waiver of a right of forfeiture for such breach.' *Lindsey* v. *Lindsey*, 45 Indiana, 552, p. 567; 2 Washb. Real Prop. 16. A mere indulgence is never construed into a waiver of a breach of condition. *Gray* v. *Blanchard*, 8 Pick. 284; *Jackson* v. *Crysler*, 1 Johns. Cases, 125."

In *Trustees of Union College* v. *City of New York*, 173 N. Y. 38, a deed conveying land to Long Island City for the purpose of building a city hall contained the provision that if the land should cease to be used for such or other similar buildings the land should revert to the grantor as if the conveyance had not been made, was held to be a condition subsequent and required the grantee to comply therewith within a reasonable time. It was further held that ten years was a reasonable time for compliance with the covenant, and that the fact that the grantor did not assert a right to reënter for fifteen

years after the breach did not operate as an estoppel or preclude him from insisting upon a forfeiture and claiming possession.  It was also held that a grantor was not compelled to demand performance before bringing action of ejectment. The court said (p. 42):

"The condition was the use and the continuing use of the land for the purpose of the grant.  The long-continued silence of the plaintiff could not operate as an estoppel upon, or preclude, it from insisting upon a forfeiture, and from claiming possession of the premises.  The effect of an express condition in a deed cannot be destroyed by silent acquiescence.  (*Jackson* v. *Crysler*, 1 Johns. Cases, 125.)  The title to the property was vested in the grantee and the plaintiff was entitled to assume that its grantee would comply with the condition of the grant.  If it elected to await compliance as long as it did, that fact cannot be construed against its right to reclaim possession."

In *Althea Coleman* v. *Ralph Whitney et al.*, 62 Vermont, 123, a mortgage deed was executed by a husband, the condition of which was a promise to support the wife of the grantor during her life.  The condition was performed for a time and then violated.  The wife brought suit to obtain a maintenance from the mortgaged premises.  It was held that she was entitled to such relief, notwithstanding there had been successive conveyances of the property, and the successive owners had occupied the premises under their deeds, and had, in no way recognized her rights; and it was held further, that the obligation to support the wife was a continuing one, and that "the lapse of fifteen years without receiving support, simply because she did not ask it, would be no bar."

It was said in *Oliver et al.* v. *Piatt*, 3 How. 333, 411, that the mere lapse of time constitutes of itself no bar to the enforcement of a subsisting trust; and time begins to run against a trust only from the time when it is openly disavowed by the trustee, who insists upon an adverse right and interest, which is fully and unequivocally made known to the *cestui que trusts*.

In *Tynan* v. *Warren*, 53 N. J. Eq. 313, 321, Vice Chancellor Green, speaking for the court, said: "I do not understand that mere delay in bringing a suit will deprive a party of his remedy, unless such neglect has so prejudiced the other party by loss of testimony or means of proof, or changed relations that it would be unjust to now permit him to exercise his right." It is certain that none of those conditions appear in the present case. A mere change of the curriculum was not of itself an unequivocal disavowal of the trust, or an assertion of adverse right or interest in the government, and we find nothing in the record tantamount to such disavowal and assertion until the Governor of the Territory and the Superintendent, of Public Instruction refused the demand of the plaintiffs' attorney to either pay the $15,000 or reconvey the property. The grounds of their refusal we are not informed of, but it was a disavowal of the trust and a denial of the alternative obligation to pay the money. The right of election in the Territory then passed to the plaintiffs, appellants here, and the bringing of the action was a sufficient exercise of it.

It is finally contended that the appellant cannot maintain this action. The Supreme Court of the Territory sustained this contention, saying, however, that it based its "decision upon the consideration of the substantial rights involved." The right of the plaintiffs is derived from a deed executed July 25, 1903, by the American Board of Commissioners for Foreign Missions to the plaintiffs as "trustees." It recites that the grantor is desirous of contributing to the support and maintenance of the Board of Hawaiian Evangelical Association, an eleemosynary corporation organized and established "in the great work of propagating Protestant Christianity, and for that purpose the land and property particularly described and referred to was conveyed in trust in order to assist said intended beneficiary to effectually carry out its corporate powers and purposes in said Hawaiian Islands." The instrument revokes and annuls all powers of attorney and grants of authority theretofore given to any person or persons whomso-

ever, and gives, grants, bargains and sells, conveys and confirms, unto F. J. Lowrey, Henry Waterhous and William O. Smith certain lands described in the schedule annexed to the instrument, together with "all other lands in the possession of or belonging to the said grantor or to which said grantor has right, title, interest, claim or demand whatsoever, at law or in equity, and whether held by it in fee simple, as lessee thereof, beneficiary therein, or otherwise, as fully and to all intent and purpose as though a particular description thereof was herein incorporated and included in said schedule . . . ." to have and to hold the same "in trust, nevertheless for the following uses and purposes, that is to say: First. To hold, manage and control the same, and receive and take the rents, issues, profits, income and proceeds of sales and authorized mortgages thereof, and hold such increment and realizations under the same trusts as the above granted trust property, using and applying the same, however, in the manner hereinafter provided. . . . Sixth. And, generally to do and perform every act and thing and exercise every power and authority whatsoever, not herein specifically denied or withheld from or herein directed to be otherwise done or exercised by said trustees, as fully and to every intent and purpose as though the said trustees were the absolute owners in fee in their own personal right of the property hereby conveyed. Seventh. Any and all moneys arising from or out of the property of the trust estate, whether by way of rents or other issues and income or from sales or mortgages thereof, shall be received and held by said trustees;" and, after the payment of taxes, and other expenses, "and until otherwise directed," by the grantor, shall be delivered "to said beneficiary, from time to time, any balance or portion of the moneys, then remaining in their hands over and above what may, in their judgment, be required for the current expenses connected with the said trust, any unapplied balance to be placed on general deposit, or the said trustees may invest the same upon security as they may approve."

And the grantor reserved "the full right and authority, at any time or times, to direct any change or alteration in the disposition of the income and proceeds of the trust estate," or to remove any trustee or fill any vacancy however occurring.

It will be observed, therefore, that the instrument was designed to convey every interest in property that the grantor had. Considering its language and careful provisions, its purposes and the control reserved to the grantor of the trust and the disposition of funds, it would be a narrow construction of it to hold that the interest of the grantor in the Lahainaluna school did not pass by it, whether such interest was a right to receive a conveyance of the school or of the $15,000 which was to be in lieu of such conveyance. In other words, to completely enforce the rights and interests of the mission in the school and devote it or the proceeds from it to the purposes of the trusts which were created.

*The judgment is reversed and the cause is remanded with directions to enter judgment for appellants as prayed for.*

Mr. Justice Brewer took no part in the decision.